50 So.2d 237

## LUNDY v. NORTHINGTON.
### 6 Div. 912.

Supreme Court of Alabama.
Feb. 1, 1951.

Fred Fite, of Hamilton, and Bob Moore, Jr., of Winfield, for appellant.

Fite and Fite and Bill Fite, of Hamilton, for appellee.

LAWSON, Justice.

Appellee filed a bill of complaint in the circuit court of Marion County in equity to have that court establish and define an uncertain or disputed boundary line between alleged coterminous lands of appellee and appellant. § 3, Title 47, and § 129, subdiv. 5, Title 13, Code 1940; Smith v. Cook, 220 Ala. 338, 124 So. 898; Sellers v. Valenzuela, 249 Ala. 627, 32 So.2d 517.

Appellee owns land situated to the south and east of land owned by the appellant. In paragraph 3 of his bill of complaint, appellee alleged in substance that the boundary between his land on the south and appellant's land on the north was a wire fence located on the southern boundary line of the Northwest quarter of Section 1, Township 11, Range 16. In the same paragraph of the bill, it was alleged that the boundary line between appellee's property on the east and appellant's property on the west is as follows: "Begin at twin sweetgum stumps at wire fence on South boundary line of NW 1/4 of Section 1, Township 11, Range 16 near corner of pasture; thence north a distance of 417 yards, more or less, to intersection of turn row and terraces; thence continuing north along turn row a distance of 426 yards, more or less, to corner of pasture fence; thence continuing north along said fence a distance of 160 yards, more or less, to oak tree on south side of Bexar Mail road; thence north in same direction a distance of 83 yards to township line."

The bill prayed that the boundaries be established as alleged therein.

Appellant answered and made his answer a cross bill. In pertinent part the answer and cross bill is as follows:

"2. Respondent and cross-complainant denies the allegations of paragraph 3 of the bill of complaint and says: The true boundary line between the west side of complainant's land and the east side of this respondent's land is as follows: Begin at a pine knot post and iron marker a distance of 1492.2 feet from the western boundary line of Section 1, township 11, range 16, and run North parallel to the western boundary line of said section to the Northern boundary line of said section, a distance of 2921 feet.

"The true boundary line between the North side of complainant's land and the South side of this respondent's land is as follows: Begin at a point on the western boundary line of said Section 1 at a certain rock and pine knot corner 2921 feet South of the Northern boundary line of said Section 1 and run East 1492.2 feet parallel with the Northern boundary of said Section 1 to a pine knot post and iron marker, being the same pine knot post and iron marker referred to in the paragraph immediately preceding above."

The answer-cross bill prayed that the boundaries be established as alleged therein.

Appellee answered the cross bill, denying that the boundaries were as alleged in the cross bill and averring that the true boundaries between the lands of the parties are as alleged in the complaint.

The evidence was taken ore tenus before the trial court and a decree was entered fixing the boundaries substantially as alleged in the complainant's bill. From such decree Lundy, respondent-cross complainant, has appealed to this court.

Levi Northington and wife, Sara T. Northington, residents of Marion County, had four sons, one of whom died in infancy. The other three sons we w' refer to as John, Frans, and Jim.

Among other real property in Mar County, Levi Northington owned the nort west quarter and the southwest quart. of Section 1, Township 11, Range 16. We will not hereafter refer to township and range except when quoting. Section 1 contains more than the standard 640 acres, there being approximately 710 acres in the section. The conveyance by which Levi Northington secured title to the northwest quarter of Section 1 shows that said quarter section contains 177 1/2 acres. However, counsel for both parties to this appeal treat that quarter section as containing only 170 acres. We will so consider it. There is no record evidence showing the acreage of the southwest quarter of Section 1, although a surveyor who testified on behalf of appellant stated that each of the quarter

sections in said Section 1 contained approximately 178 acres; but the acreage of the southwest quarter is not material here.

On December 18, 1903, Levi Northington executed a warranty deed, in which his wife joined, whereby he conveyed the southwest quarter of Section 1 to his son Frans, the appellee here. Frans still had title to this quarter section at the time this case was tried.

On the same day, that is, December 18, 1903, Levi Northington conveyed to his wife, Sara T. Northington, by warranty deed the following described lands situated in Marion County: "The NW 1/4 of Sec. One, T. 11, R. 16. *Also 70 acres off of the East side of the NW 1/4 of Sec. One, T. 11, R. 16,* containing 230 acres, more or less * * *" (Emphasis supplied.)

There is parol testimony to the effect, and the fact seems to be admitted, that in 1903 Levi Northington conveyed by warranty deed to his son John 100 acres off the west side of the northwest quarter of Section 1. However, no such deed was introduced. According to the testimony, the 1903 deed to John was defective and, therefore, in 1909 his father, Levi, executed another deed for the purpose of correcting the defects of the 1903 deed which he had executed to John. The record shows a warranty deed executed on August 7, 1909, by Levi Northington and wife wherein the following described property in Marion County was conveyed to John: "100 acres off on the West side of Section 36, T. 10, Range 16 of the SW quarter, *also 100 acres off on the West side of the NW quarter of Sec. one of Fractional T. 11, R. 16* & also the North 1/2 of the SE quarter of Sec. 2, T. 11, R. 16 containing in all 280 acres more or less, * * *." (Emphasis supplied.)

So it appears from the conveyances above referred to that by 1909 at the latest, Levi Northington had divested himself of all title to the southwest quarter and of title to 170 acres in the northwest quarter of Section 1. His son Frans owned the southwest quarter, his wife, Sara T., owned the east 70 acres of the northwest quarter, and his son John owned the west 100 acres of the northwest quarter.

Mrs. Sara T. Northington died a number of years ago; the exact date of her death does not appear. At the time of her death she still owned land in the northwest quarter of Section 1. It appears that she died intestate and that her sons, John, Frans, and Jim were her only heirs at law. There was no division among these three sons of the property which their mother owned in the northwest quarter of Section 1 prior to the death of John. So each of them owned an undivided one-third interest in the land owned by their mother in the northwest quarter of Section 1 at the time of her death.

John died in 1942, still owning land in the northwest quarter of Section 1. We must assume from this record that John died intestate and that his sole heirs at law were his brothers, Frans and Jim.

Thus, after the death of John, his brothers, Frans and Jim, each owned an undivided one-half interest in all of the northwest quarter of Section 1. To illustrate, prior to John's death, John, Frans and Jim, as heirs at law of their mother, each owned an undivided one-third interest in the lands which their mother owned in said quarter section. Upon the death of John, Frans and Jim each inherited from John a one-sixth undivided interest in the land their mother had owned in that section, thus giving to each of them an undivided one-half interest in all the lands which their mother had owned in said quarter section at the time of her death. Also as heirs of John, they each inherited an undivided one-half interest in all the land which John had owned in the said quarter section at the time of his death. Treating the northwest quarter of Section 1 as containing only 170 acres, all the land in the said quarter section was owned by John and his mother; consequently, as before stated, after the death of John, the mother having predeceased him, Frans and Jim each owned a one-half undivided interest in all the land in the northwest quarter of Section 1.

It appears that John and Mrs. Northington had owned land other than that in the northwest quarter of Section 1. Frans and Jim evidently undertook to divide the

land which they had inherited and to that end executed conveyances to each other. These conveyances were not drawn so as to convey the undivided one-half interest which each held in a specific piece of property, but were drafted as if each owned the entire interest in the tracts described in the conveyances. But this does not affect the interest of the grantee in the deed, who already had an undivided one-half interest in the land conveyed. The deeds were effectual to divest the grantor of the interest which he did have in the lands conveyed.

On October 16, 1942, Jim and wife executed a warranty deed conveying to Frans the following described property in Marion County: "Frac. NE 1/4 Section 1 Twp. 11, Range 16 West; *also 70 acres off of East side of NW 1/4 of Section 1, Twp. 11, Range 16 West,* containing 230 acres, more or less; also N 1/2 of SE 1/4, Section 2, Twp. 11, Range 16 West, containing 80 acres, more or less." (Emphasis supplied.)

The following day, October 17, 1942, Frans and wife executed a warranty deed conveying to Jim the following described land in Marion County: "100 acres off of the west side of Sec. 36, T. 10, R. 16 of the SW quarter; *also 100 acres off of the west side of the NW quarter of Sec. one of Fractional T. 11, R. 16;* also the W 1/2 of the SE 1/4 and the E 1/4 of the SW 1/4 of Section 36, T. 10 R. 16, containing 120 acres, more or less." (Emphasis supplied.)

As a result of these two conveyances, Frans held the record title to seventy acres off the east side of the northwest quarter of Section 1, the same record title that his mother had held in that section as a result of the 1903 conveyance from her husband, Levi, and Jim held the record title to 100 acres off the west side of the northwest quarter of Section 1, the same record title which his brother John had held through the conveyances of 1903 and 1909 from his father.

Jim died within a short time after these two conveyances were executed. On December 3, 1945, Jim's widow, his two daughters and their husbands executed a warranty deed conveying to Jake and Kelly Lundy the following described land in Marion County: "One hundred acres off of the West side of Section 36, T. 10, R. 16 of the SW 1/4; *and also one hundred and twelve acres off of the West side of the NW 1/4 of Section one of fractional T. 11 R. 16* and also the W 1/2 of the SW 1/4 of Section 36, T. 10, R. 16, containing 120 acres, more or less." (Emphasis supplied.)

Although this deed described the land conveyed in the northwest quarter of Section 1 as being 112 acres off the west side of that section (the figure 120 is used in an abstract introduced in evidence), it is conceded by the grantees therein that the figure 112 (120) is a mistake of the scrivener, in that Mrs. Jim Northington instructed the scrivener to use the same description of the land as had been used in the conveyance of October 17, 1942, from Frans to her husband, Jim. With this concession, the description from Jim's widow and others is the same as the description used in the deed from Frans to Jim under date of October 17, 1942.

On December 17, 1945, Jake Lundy and wife executed a warranty deed to Kelly Lundy conveying the following described property in Marion County: "100 acres off of the west side of the NW¼ of Section 1, Township 11, Range 16."

This conveyance was drawn as if Kelly Lundy did not already have record title to an undivided one-half interest in the property described in the conveyance. But in any event, after the execution of this deed by Jake Lundy to Kelly Lundy, the latter had the record title to 100 acres off the west side of the northwest quarter of Section 1.

As before indicated, the land of Kelly Lundy situate in the northwest quarter of Section 1 is bounded on the south and east by that of Frans Northington.

Within a short time after the deeds were executed to him, Kelly Lundy had a survey made so as to give him 100 acres off the west side of the northwest quarter of Section 1. This survey placed the southern boundary of Lundy's land slightly south of

the line which Frans Northington, appellee, contended had been considered for at least thirty years as the boundary line between his land on the south (southwest quarter of Section 1) and the land formerly owned by his brother John and his mother on the north, situate in the northwest quarter of Section 1. The survey also placed the eastern boundary of Lundy's land east of the line which appellee insisted had for many years been considered as being the dividing line between the property formerly owned by his mother on the eastern side of the northwest quarter and that owned by his brother John on the western side of that quarter section. Appellant took the position that his deed called for 100 acres off the western side of the quarter section, there being no other description in the deed, and that, therefore, he was entitled to the acreage called for in his deed. The appellee took the position that Lundy under his deed was entitled to only the land situate in the northwest quarter of Section 1 which had been considered throughout the years as being owned by appellee's brother John.

The parties being unable to settle their differences, this proceeding was instituted to have boundary lines fixed between the lands of the parties.

Under the pleadings, the line separating appellee's land on the south and appellant's land on the north was fixed as the southern boundary line of the northwest quarter of Section 1. We have no disagreement with this part of the decree of the trial court, in view of the evidence which related to the location of the southern boundary line of the northwest quarter of Section 1. We are not willing to say on this record that the trial court erred in finding that the south boundary of the northwest quarter of Section 1 is located as claimed by appellee and that appellee's fence is on that line and separates his land on the south from appellant's land on the north.

However, we are of the opinion that the trial court erred in fixing the boundary line between the lands owned by appellant and appellee in the northwest quarter of Section 1. We think it clear that the trial court's action was based on a finding from the evidence that although John had record title to 100 acres off the west side of the northwest quarter, he did not own that much land in that section because his mother had acquired by adverse possession all of the land in the said quarter section east of the line fixed by the trial court as the boundary line. We will assume for the purpose of this appeal that the evidence is ample to support a finding that John and his mother had agreed on the line which the trial court fixed as the boundary line between appellant and appellee, as being the dividing line between their properties in the northwest quarter of Section 1. We will assume that the holding of the mother up to that line was of sufficient duration and of such a character as to give her title by adverse possession to all the land lying east of the agreed boundary line and west of the land to which she was entitled under her deed from her husband, Levi.

But this fact is not controlling of the rights of appellant and appellee. After John's death, as we have indicated above, Frans and Jim became the owners of all interest in the land situated in the northwest quarter of Section 1, irrespective of any questions as to the quantity of land in the said quarter formerly owned by their mother and brother John. There is no evidence in this record sufficient to support a finding that after the death of John, Frans and Jim held land in the northwest quarter of Section 1 adversely to each other.

After the conveyance by Frans to Jim of 100 acres off the northwest quarter of Section 1, Jim became the owner of that land, irrespective of any boundary line which might have been treated by John and his mother as dividing their land in the said quarter section. Jim's wife and his other heirs at law conveyed that 100 acres to Jake and Kelly Lundy and Jake Lundy conveyed his interest in that 100 acres to Kelly Lundy.

Consequently, we are of the opinion that as the matter now stands, Kelly Lundy is entitled to 100 acres off the northwest quarter of Section 1.

The position taken by appellee seems to be that when he and Jim agreed to a divi-

sion of the lands which they had inherited from their brother and mother, located in the northwest quarter of Section 1, they intended that Jim was to have only the land in that quarter section owned by John at the time of his death, and that Frans was to have the land in that quarter section owned by his mother at the time of her death, which included, according to appellee's contention, all the land east of the boundary line fixed by the trial court. But the trouble with this position is that the deeds do not recite such an intention. There is no ambiguity in the deeds; they call for specific acreage of an amount which each grantor had the right to convey.

The fact that Kelly and Jake Lundy had lived near the land owned by the Northingtons and were familiar with the fact that John and his mother considered the boundary line between their properties in the northwest quarter of Section 1 as being that fixed by the trial court does not affect the decision in this case. As before pointed out, after the death of John and Mrs. Northington, all the property owned by them in that quarter section was inherited by Jim and Frans. Thereafter, the line agreed upon between John and Mrs. Northington in effect had no bearing on the extent of the interests owned by Frans and Jim in the said quarter section.

We point out that we are not here dealing with a case wherein a reformation of a deed is sought, such as was the situation in the case of Copeland v. Warren, 214 Ala. 150, 107 So. 94, wherein, after the cause was removed to the equity court, the bill sought reformation of the conveyance because of mutual mistake, as well as the establishment of a division line. Neither the pleadings nor the evidence in this case would support a decree of reformation.

The decree is reversed and the cause is remanded.

Reversed and remanded.

FOSTER, SIMPSON, and STAKELY, JJ., concur.